UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MATTHEW J. FECTEAU,

                          Plaintiff,

        v.

THE CITY OF MOUNT VERNON, *et al*.,

                          Defendants,

SAFETY NATIONAL CASUALTY
CORPORATION,

                          Non-Party.

---

No. 23-CV-9173 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Matthew J. Fecteau
Mount Vernon, NY
*Pro Se Plaintiff*

Andrew C. Quinn, Esq.
Lalit K. Loomba, Esq.
The Quinn Law Firm
White Plains, NY
*Counsel for Defendants The City of
Mount Vernon, Sergeant Mario Stewart,
Detective Montika Jones,
Dawnette McClaren-Nelson,
David Gibson, and Patrick Holder*

Daniel Brett Fix, Esq.
Gordon Rees Scully & Mansukhani, LLP
Harrison, NY
*Counsel for Defendant Charlene Humphreys*

Michael S. Komar, Esq.
Melissa K. Driscoll, Esq.
Menz Bonner Komar & Koenigsberg LLP
Rye Brook, NY
*Counsel for Non-Party*

KENNETH M. KARAS, United States District Judge:

Plaintiff Matthew J. Fecteau ("Plaintiff") brings this Action pursuant to 42 U.S.C. § 1983 against the City of Mount Vernon (the "City"), Sergeant Mario Stewart, Detective Montika Jones, Charlene Humphreys, Dawnette McClaren-Nelson, David Gibson, and Patrick Holder (together with the City, "Defendants"), alleging multiple constitutional violations. (*See generally* Dkt. No. 56 ("Amended Complaint" or "Amend. Compl.").)[1]

Before the Court are the following Motions:

- The City's Motion to Dismiss Plaintiff's *Monell* claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) (the "Motion"), (*see* Dkt. No. 67);

- Plaintiff's Motion to Compel Joinder of Non-Party Safety National Casualty Corporation ("Safety National") as a Third-Party Defendant pursuant to Rules 19(a) or 20(a)(2) (the "Motion for Joinder"), (*see* Dkt. No. 76);

- Plaintiff's Motion for Sanctions pursuant to Rule 37(e) Due to Spoliation of Evidence (the "Spoliation Motion"), (*see* Dkt. No. 126);

- Plaintiff's Motion for Judicial Notice Pursuant to Federal Rule of Evidence 201, to the extent such motion seeks reconsideration of the Court's January 16, 2025 Order denying Plaintiff's Motion for Declaratory Judgment (the "Reconsideration Motion"), (Dkt. No. 145);[2] and

- Plaintiff's Pre-Motion Letter requesting leave to file a Motion for Sanctions and to Strike Portions of the City's Motion to Dismiss (the "Pre-Motion Letter"), (Dkt. No. 149).

For the reasons that follow, all Motions are denied.

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

[2] The remaining issues raised in Plaintiff's Motion for Judicial Notice were addressed by Judge McCarthy in her March 10, 2025 Order. (*See* Dkt. No. 159 at 14–17.) This Action was previously referred to Judge McCarthy for general pretrial issues. (*See* Dkt. No. 130.)

I.  Background

A.  Factual Background

Unless otherwise stated, the following facts are drawn from the Amended Complaint and the exhibits therein,[3] as well as Plaintiff's opposition papers and the exhibits therein and two exhibits submitted by the City in connection with its Motion.[4]  The facts alleged therein are

---

[3]  The Court notes that the materials Plaintiff attached to the Amended Complaint—which include a complaint and accompanying exhibits submitted in an unrelated case—do not appear to be relevant to the instant Action.  (*See* Amend. Compl. Exs. 1–4 (Dkt. Nos. 56-1–56-4) (documents from *Paige v. Dig. Bus. Networks Alliance, Inc., et al.*, No. 24-CV-3169 (S.D.N.Y.)).)  Because Plaintiff does not cite or otherwise refer to these documents in either his Amended Complaint or his Opposition, and their relevance is not readily apparent, the Court will not consider these documents further in connection with the Motion.

[4]  Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002); *accord Doe v. County of Rockland*, No. 21-CV-6751, 2023 WL 6199735, at *1 (S.D.N.Y. Sept. 22, 2023).  "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Thomas*, 232 F. Supp. 2d at 275; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (same).  Moreover, the Court's "mandate to read the papers of pro se litigants generously makes it appropriate to consider [a] plaintiff's additional materials, such as [the] opposition memorandum," *Williams v. Barometre*, No. 20-CV-7644, 2022 WL 903068, at *2 n.4 (S.D.N.Y. Mar. 28, 2022) (quotation marks and citation omitted), "to the extent that those allegations are consistent with the Amended Complaint," *Veras v. Jacobson*, No. 18-CV-6724, 2020 WL 5659551, at *1 n.1 (S.D.N.Y. Sept. 23, 2020); *see also Floyd v. Rosen*, No. 21-CV-1668, 2022 WL 1451405, at *3 (S.D.N.Y. May 9, 2022) (considering exhibits attached to pro se opposition memorandum).

In connection with his Opposition, Plaintiff attaches: (i) an excerpt from an August 5, 2019 Report by the New York State Senate Committee on Investigations and Government Operations in conjunction with the New York State Senate Committee on Housing, Construction & Community Development, entitled: "Final Investigative Report: Code Enforcement in New York State, (*see* Pl's Opp'n 17–18); (ii) an excerpt from an April 15, 2024, letter from the Director of the New York State Department of State's Division of Building Standards and Codes to the Hon. Shawyn Patterson-Howard, Mayor of the City of Mount Vernon, (*see id.* at 19–20), and (iii) an affirmation from Mount Vernon Second Deputy Corporation Counsel submitted in the State action against Plaintiff, (*see id.* 21–22).  In connection with its Reply, the City submits full versions of the August 5, 2019 Report ("the Senate Report") and the April 15, 2024 letter to the Mayor of Mount Vernon (the "DBSC Letter").  (*See generally* Reply Decl. of L. Loomba,

assumed true for the purpose of resolving the instant Motions.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

        1.   The Senate Report and DBSC Letter

      In February 2019, a New York State Senate Committee opened an investigation into the administration and enforcement of the Uniform Fire Prevention and Building Code, specifically focusing on four municipalities including the City.  (Senate Report 5; *see also* Opp'n 7–8.)  As detailed in the Senate Report published in August 2019, the investigation revealed, inter alia: "[i]nadequate training for code enforcement personnel; [i]nadequate recordkeeping for tracking code cases; [i]nsufficient penalties for violations; . . . and [a]n overall lack of resources and support available to assist code enforcement programs."  (Senate Report at 65.)  The Report also noted there was a general "neglect in code enforcement through New York State," including "apathetic enforcement practices" and "trivial monetary fines for violations."  (*Id.* at 68.)  The Report concluded that "the State is disregarding its obligations to assist in code enforcement" and emphasized that "[c]ode enforcement officials must diligently inspect properties and cite violations."  (*Id.* at 8–9.)

---

Esq. in Supp. of Mot. ("Loomba Reply Decl.") (Dkt. No. 74); Loomba Reply Decl. Exs. B and C (Dkt. Nos. 74-1 and 74-2).)  Because these documents were referenced and relied upon by Plaintiff in his Opposition, and because there is no dispute over their authenticity, the Court will consider the full versions of the exhibits.  *See Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) ("Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed.") (emphasis omitted); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations adopted) (quotation marks omitted)).

As for the City specifically, the investigation concluded that the City imposed "insufficient fines," had a "need for more substantive training of code enforcement officials," had a "severe shortage of officials performing code enforcement activities," and had "an overall lack of resources available to assist code enforcement officers perform their duties." (*Id.* at 85–86.)  The Report also noted that the City's "Department of Buildings failed to provide the investigative team with the standard operating procedures ["SOPs"] of the Department for inspections and violations." (*Id.* at 50.)

In April 2024, the New York Department of State wrote a letter to the City's Mayor, notifying her of "certain specific and general deficiencies in the City's administration and enforcement of the Uniform Code." (DBSC Ltr. 1.)  The deficiencies included, inter alia, an inadequate amount of "periodic fire safety and property maintenance inspections," and inadequate recordkeeping, including "missing inspection reports, missing construction documents . . . , and/or violations noted without any follow up," which suggested "the City has not established and does not maintain an appropriate system of records of its code enforcement program and practices." (*Id.* at 2.)  The letter included recommendations of specific action items to "assure that the City Building Department . . . perform all required code enforcement activities in the City." (*Id.* at 3.)

### 2.  Inspections of Plaintiff's Property

Plaintiff, an "information operations officer serving with the [U.S.] Special Operations Command," (Amend. Compl. ¶ 9), owns a residential property in Mount Vernon, New York (the "Property"), (*id.* ¶¶ 4, 19).  Plaintiff temporarily rented out the first-floor unit in the Property to a tenant, intending for the tenant to vacate the Property upon his return from military deployment in September 2022, at which time Plaintiff would occupy the unit. (*Id.* ¶¶ 4, 31.)  While

deployed to "a combat zone" during 2018–2019, Plaintiff hired a contractor to renovate the basement of the Property; the renovation was completed in 2019. (*Id.* ¶ 19.)

Plaintiff alleges that, on September 1, 2022—while he was still deployed away from Mount Vernon—he received a call from two members of the Mount Vernon Building Department, Humphreys and Davis, who accused Plaintiff of conducting "unauthorized construction" in the basement of the Property. (*Id.* ¶ 33.) Although Plaintiff informed Humphreys and Davis that "only painting and caulking were performed, not construction," Plaintiff was subsequently issued a "Stop Work Order." (*Id.*) Throughout September 2022, Plaintiff unsuccessfully attempted to reach the Building Department several times by phone and email to discuss the Stop Work Order, but "each call [went] to voice mail and the voice mail say it [was] full." (*Id.* ¶¶ 34–35.) Plaintiff also requested that the Building Department provide him with inspection reports, which he was denied.[5] (*Id.* ¶ 33.)

Multiple times that month—presumably after Plaintiff returned from deployment, (*id.* ¶ 20)[6]—Plaintiff "vist[ed] [his] property or at least dr[ove] by," (*id.* ¶ 35.) When he did so, he several times witnessed "a[n] African American woman" he now believes to be Humphreys "coming on and off the property." (*Id.*) Throughout October and November of 2022, Plaintiff again observed the person he believes to be Humphreys "lingering around [his] property, . . . even enter[ing] the residence of [Plaintiff's] tenant" and "appearing familiar with [the tenant]," whom Plaintiff was attempting to evict at that time. (*Id.* ¶¶ 31, 36.)

_____

[5] Plaintiff was shown "some documents," which allegedly did not contain "evidence of construction activities or include[] photographs" of said activities. (*Id.* ¶ 33.)

[6] Plaintiff notes that he returned from deployment in September 2022, (*id.* ¶ 20), although he later states that he returned to Mount Vernon in December 2022, (*id.* ¶ 38.)

In December 2022, Plaintiff went to the police station in Mount Vernon to "address the persistent problems [he] was experiencing with the Building Department and [his] tenant." (*Id.* ¶ 38.) However, the police informed him they did not handle those type of issues. (*See id.*) While Plaintiff was at the station, he received an "urgent call" from one of his contractors, informing him that Humphreys was at the Property. (*Id.*) Plaintiff immediately called Humphreys and asked if she had a "valid warrant to search [his] apartment complex." (*Id.*) At this, Humphreys "became loud" and informed Plaintiff he had an illegal apartment in the basement of the Property "due to installed cabinets." (*Id.*) Plaintiff then received a second "Stop Work Order" for the illegal basement apartment. (*Id.*)

Plaintiff then met with the Department of Buildings to discuss the situation. (*Id.* ¶ 39.) During this meeting, Plaintiff was questioned about the "electrical setup of the [P]roperty," the responsibility for which, Plaintiff claims, laid with his tenant per their lease agreement. (*Id.* ¶¶ 39–40.)[7] Plaintiff was also informed by Humphreys that there was a leak in the apartment and that, to resolve the Stop Work Orders, he would need to pay a fee of $500 per order. (*Id.* ¶ 40.) Plaintiff refused to process any payments until he could verify the claims. (*Id.*) Shortly thereafter, Plaintiff again left town on military duty. (*Id.*)

On January 4, 2023, Plaintiff was informed by his contractor that he had received a violation notice on his door, fining him approximately $1,000 a day for the ongoing "construction." (*Id.* ¶ 41.) The notice was signed by Humphreys and Deputy Commissioner Dawnette McLaren-Nelson. (*Id.*) Plaintiff received similar notices over the next two days. (*Id.* ¶¶ 42–43.) The same week, Plaintiff also received multiple phone calls from Humphreys from

---

[7] Plaintiff's tenant allegedly informed Plaintiff she would not vacate the Property unless he compensated her "$8,000 for alleged electrical work." (*Id.* ¶ 39.) Her refusal to vacate left Plaintiff "with only the basement to sleep in at night." (*Id.* ¶ 31.)

different numbers, which Plaintiff "immediately disconnected." (*Id.* ¶ 44.) On the one call Plaintiff did answer, Humphreys informed him that the Department of Buildings would accept cash payments for his "fines." (*Id.*) During this week, Plaintiff was also informed by one of his contractors that Humphreys "physically entered the third-floor apartment without a warrant." (*Id.*)

On January 9, 2023, Plaintiff emailed the Department of Buildings Commissioner Patrick Holder about the issues, who advised Plaintiff to apply for a permit. (*Id.* ¶ 45.) However, Holder's subordinates—Jaime Pessin and Humphreys—blocked Plaintiff from filing any permit applications until he settled the outstanding fines related to his ongoing "construction," which Plaintiff maintains was "merely caulking and painting in [his] basement." (*Id.*)

On January 21, 2023, while Plaintiff was in the basement of the Property discussing fire prevention measures with his contractor, Plaintiff's tenant "instructed her son" to tell Humphreys that Plaintiff was on the property. (*Id.* ¶ 47.)[8] When Humphreys arrived on site, she informed Plaintiff she had received a phone call regarding work being done in the basement. (*Id.*) After "conduct[ing] no inspection," Humphreys cited Plaintiff for construction and later issued him another "Stop Work Order." (*Id.*)[9] Plaintiff claims that his assistant was informed that, by this point, Plaintiff's fines totaled $1,500 relating to the Stop Work Orders and a $125 fee for reinspection of a door. (*Id.* ¶ 49.)

---

[8] The tenant also allegedly called the police, claiming there were intruders in her house. (*Id.*) When the police arrived, they "dismissed [the] tenant's allegations." (*Id.*)

[9] Plaintiff alleges that he has video footage of this incident. (*Id.*)

Plaintiff alleges that from September 2022 to March 2023, the Building Department inspected the Property "approximately 20 to 30 times, including weekends, holidays, and evenings." (*Id.* ¶ 21.) Specifically, Plaintiff alleges that:

- On February 20, 2023, Humphreys trespassed into Plaintiff's backyard and began harassing his workers, demanding "they stop patching cement[,] cleaning the gutters," and "drilling." (*Id.* ¶ 54.) Humphreys issued another "Stop Work Order" for this incident. (*Id.*)[10] Plaintiff later emailed Commissioner Holder to report the incident as harassment and similarly filed a complaint with the Department of State with the Department of Buildings, for "harassment" and "failing to fulfill their code enforcement duties." (*Id.* ¶ 56.)

- On February 26, 2023, Pessin and Humphreys entered the Property, accompanied by Mount Vernon Police, including Detective Montika Jones. (*Id.* ¶ 58.) Humphreys allegedly claimed she had the right to be on the Property due to a "Stop Work Order" on the door and proclaimed that a warrant was not needed to enter the Property. (*Id.*) After entering the Property, Pessin, Humphreys, and the Mount Vernon Police barricaded the basement, "effectively leaving [Plaintiff] homeless." (*Id.* ¶ 59.)

- On March 1, 2023, Sergeant Mario Stewart entered the Property without a warrant, detained Plaintiff's contractor, and accused Plaintiff of "attempted burglary" for having his contractor try to replace a lock on a detached garage.[11] (*Id.* ¶ 63.)

- On March 3, 2023, after Plaintiff called the police "preemptively" to observe him changing a lock on the detached garage, Department of Buildings personnel and Sergeant Stewart unlawfully entered the Property and inspected the basement. (*Id.* ¶ 65.) Plaintiff subsequently received a summons "for patching cement without a permit." (*Id.*)

- On March 13, 2013, Humphreys performed an "unauthorized search" and "inspection" of the Property, ostensibly related to fire code standards. (*Id.* ¶ 68.)

- On March 15, 2023, another unauthorized search occurred, wherein a notice was affixed to the basement door of the Property, declaring the basement "Dangerous." (*Id.* ¶ 71.)

---

[10] Plaintiff alleges that, upon receiving Humphreys' "work records," she was off duty on this day, which Plaintiff notes was a holiday (President's Day). (*Id.*)

[11] The lock was allegedly "unlawfully altered" by Plaintiff's tenant. (*Id.*)

- On February 16, 2024, another inspection of the Property occurred with Mount Vernon Corporation Counsel present.  (*Id.* ¶ 82.)

Throughout this time period, Plaintiff filed multiple complaints with the Department of Buildings, the Department of State, the Mount Vernon Mayor, Mount Vernon Police Department ("MVPD") Internal Affairs, and the Mount Vernon City Council, describing the repeated inspections as harassment and seeking records related to the inspections, his alleged violations, and disciplinary records of the individuals involved.  (*See id.* ¶¶ 45, 48, 52, 55–57, 61–62, 66–67, 70, 72–73, 75–77, 79.)

### B.  Procedural Background

Plaintiff, filing pro se, initiated this Action on October 18, 2023.  (*See* Compl. (Dkt. No. 1).)  On March 14, 2024, the City submitted a letter requesting leave to file a Motion to Dismiss.  (*See* Dkt. No. 41.)  After a status conference with the Court, (*see* Dkt. (Minute Entry for Mar. 27, 2024)), Plaintiff filed an Amended Complaint on April 30, 2024, (*see* Dkt. No. 56).  The City submitted another request to file a Motion to Dismiss, (*see* Dkt. No. 61), which the Court granted, setting a briefing schedule, (*see* Dkt. No. 62).

On July 1, 2024, the City filed its Motion to Dismiss the Amended Complaint and accompanying papers.  (*See* Not. of Mot. to Dismiss; Decl. of L. Loomba, Esq. in Supp. of Mot. (Dkt. No. 68); City's Mem. of Law in Supp. of Mot. ("City's Mem.") (Dkt. No. 69).)  Plaintiff filed his Opposition on July 4, 2024.  (*See* Pl's Opp'n; Decl. of M. Fecteau in Opp'n to Mot. ("Fecteau Decl.") (Dkt. No. 71).)  The City filed its Reply on August 22, 2024.  (*See* Loomba Reply Decl; Reply in Supp. of Mot. ("Reply") (Dkt. No. 75).)[12]

---

[12]  The Court omits from this procedural history a flurry of other motions filed by Plaintiff (including for preliminary injunctions and default judgments) that are not relevant to the instant Motions.  (*See generally* Dkt.)  The Court will not address them here other than to advise

On October 31, 2024, without requesting leave of the Court, Plaintiff filed a Motion to Compel Joinder of Third-Party Safety National, the City's insurer.  (*See* Mot. for Joinder; Decl. of M. Fecteau in Supp. of Mot. for Joinder ("Pl's Joinder Decl.") (Dkt. No. 77); Pl's Mem. of Law in Supp. of Joinder Mot. ("Pl's Joinder Mem.") (Dkt. No. 78).)  On December 6, 2024, Safety National opposed the Motion for Joinder.  (*See* Safety Nat'l Opp'n (Dkt. No. 93).)

On January 9, 2025, Plaintiff submitted a letter requesting permission to file a motion for declaratory judgment.  (*See* Dkt. No. 119.)  The Court denied the request on January 16, 2025, noting there were no "allegations, let alone evidence that the past conduct that forms the basis of Plaintiff's case [was] likely to continue."  (*See* Dkt. No. 125.)  On January 31, 2025, Plaintiff filed his Motion for Judicial Notice, seeking, inter alia, reconsideration of the Court's denial of declaratory relief.  (*See* Reconsideration Mot.; Decl. of M. Fecteau in Supp. of Mot. for Judicial Not. (Dkt. No. 146).)

On January 16, 2025, without leave of the Court, Plaintiff filed his Sanctions Motion. (*See* Not. of Mot. for Sanctions; Mem. of Law in Supp. of Mot. for Sanctions ("Pl's Sanctions Mem.") (Dkt. No. 127); Decl. of M. Fecteau in Supp. of Mot. for Sanctions (Dkt. No. 128).)  The City filed an Opposition on January 24, 2025.  (Mem. of Law in Opp. to Mot. for Sanctions ("City's Opp'n to Sanctions") (Dkt. No. 132).)

---

Plaintiff that the repeated filing of "frivolous claims and motions whose only possible explanation could be harassment and delay of proceedings" may result in sanctions.  *Azzarmi v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 20-CV-9155, 2025 WL 35003, at *9 (S.D.N.Y. Jan. 6, 2025); *see Sassower v. Field*, 973 F.2d 75, 80–81 (2d Cir. 1992) (finding an award of attorney's fees as sanctions against a pro se plaintiff was appropriate where the plaintiff had repeatedly utilized "entirely vexatious and oppressive tactics"); *Golub v. Univ. of Chicago*, No. 87-CV-2891, 1992 WL 333641, at *4 (E.D.N.Y. Oct. 26, 1992) (finding award of attorney's fees appropriate against a pro se litigant where litigant had "been adequately warned of the consequences which may result from this behavior").

On February 8, 2025, Plaintiff submitted a letter to the Court requesting permission to file another motion for sanctions and also seeking to strike portions of the City's Motion to Dismiss. (*See* Dkt. No. 149.)  The City did not respond to Plaintiff's Pre-Motion Letter.

## II.  Discussion

### A.  Motion to Dismiss

#### 1.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Markatos v. Citibank, N.A.*, No. 24-CV-803, 2024 WL 515487 (S.D.N.Y. Dec. 18, 2024) (same).

Moreover, where, as here, a plaintiff proceeds pro se, the Court must construe his submissions "liberally and interpret it to raise the strongest arguments that it suggests." *Ashmeade v. Amazon.com*, No. 23-CV-4331, 2024 WL 4266391, at *7 (S.D.N.Y. Sept. 23, 2024) (alterations adopted) (quoting *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013)); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (same).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and

13

substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics omitted) (internal quotation marks and citation omitted)).

### 2. Analysis

Plaintiff asserts four claims in the Amended Complaint: (1) a § 1983 claim for First Amendment Retaliation, (Amend. Compl. ¶¶ 86–88); (2) a § 1983 claim for unlawful searches and seizures, in violation of the Fourth Amendment, (*id.* ¶¶ 89–93); (3) a § 1983 claim for property seizure and the denial of procedural due process, in violation of the Fifth Amendment, (*id.* ¶¶ 94–98); and (4) a *Monell* claim against the City, (*id.* ¶¶ 99–100). The City moves to dismiss only the *Monell* claim. (*See generally* City's Mem.)

As to that claim, Plaintiff argues that the City is liable both due to its formal policies (i.e., Mount Vernon City Code § 149-42(A)) and its informal policies (i.e., a widespread practice or custom, failure to train, and negligent hiring). (Amend. Compl. ¶ 103.) The City argues that none of Plaintiff's alleged theories of *Monell* liability plausibly asserts a viable basis for relief and thus, the *Monell* claim must be dismissed. (*See* City's Mem. 9.)

The Court will address the City's arguments to the extent necessary to resolve the instant Motion.

### a. Applicable Law

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *15 (S.D.N.Y. Sept. 28, 2023) (quoting *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013)). However, "Congress did not intend

14

municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "Thus, 'to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'" *Taranto*, 2023 WL 6318280, at *15 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)); *see also Mumin v. City of New York*, --- F. Supp. 3d ----, 2024 WL 5146085, at *17 (S.D.N.Y. Dec. 17, 2024) (dismissing *Monell* claim against a municipality because "Plaintiff has not satisfactorily alleged the existence of a municipal policy or custom that was the moving force behind any alleged constitutional violation"); *Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong" (emphasis in original)); *Newton v. City of New York*,

566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

        "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *20 (S.D.N.Y. Mar. 19, 2024) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003)). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. County of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (citation and quotation marks omitted)); *Santana v. City of New York,* No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to

show a municipal policy.'") (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998))); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Kiss*, 2024 WL 1210941, at *21 (citations omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citing same requirements).  Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation.  There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Anilao v. Spota*, 27 F.4th 855, 874 (2d Cir. 2022) ("[A] plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir.

2018)); *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the

plaintiff "fails to state a *Monell* claim" because the plaintiff "has not pled facts demonstrating a

direct link between his injuries and the alleged municipal policy"); *Johnson v. City of New York*,

No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after

demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal

connection—an affirmative link—between the policy and the deprivation of his constitutional

rights" (quotation marks omitted)).

b.  Formal Policy

The Court first considers whether Plaintiff plausibly alleged the existence of a formal

policy endorsed by the City.  "To satisfy the 'formal policy' route, the policy must be in the form

of a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by

[the municipality's] officers.'"  *Mumin*, 2024 WL 5146085, at *19 (quoting *Monell*, 436 U.S. at

690.  A formal policy that "merely implement[s] a constitutional . . . law . . . cannot form the

basis of [a plaintiff's] *Monell* claim."  *Greene v. City of New York*, 725 F. Supp. 3d 400, 429

(S.D.N.Y. 2024).

Plaintiff alleges that Mount Vernon City Code § 149-42(A) is unconstitutional as it

allegedly "authorizes searches without due process . . . and was used to enter [Plaintiff's] home

and . . . as justification for the unconstitutional searches" in violation of the Fourth Amendment.

(Amend. Compl. ¶ 103(e)(i)(1).)  The Court concludes that Plaintiff has plausibly alleged the

existence of an unconstitutional policy.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures'" and "further provides

that 'no Warrants shall issue, but upon probable cause.'"  *City of Los Angeles, Calif. v. Patel*, 576

U.S. 409, 419 (2015) (quoting U.S. Const. Am. IV). Some "[s]earch regimes where no warrant is ever required may be reasonable where special needs make the warrant and probable-cause requirement impracticable." *Id.* at 420 (internal quotation marks and alterations omitted). "[C]ivil administrative inspection schemes, generally known as 'administrative searches,' undertaken for purposes other than to 'search for evidence of crime,'" are one such regime. *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 487 (S.D.N.Y. 2019) (alteration adopted) (quoting *Michigan v. Tyler*, 436 U.S. 499, 511–12 (1978)). In *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967), the Supreme Court clarified that municipal housing inspections were a type of administrative search covered by the Fourth Amendment's protections. 387 U.S. at 534; *see also Palmieri v. Lynch*, 392 F.3d 73, 78–79 (2d Cir. 2004) ("[A] warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances." (citation omitted); *Cox v. Dawson*, No. 18-CV-578, 2020 WL 127890, at *5 (D. Conn. Jan. 10, 2020) (citing *Camara* and noting that "a housing inspection . . . is a classic example of an administrative search"); *see also Airbnb, Inc.*, 373 F. Supp. at 487 (noting the Fourth Amendment applies to "municipal housing inspections"); *Marom v. Town of Hempstead*, No. 14-CV-3005, 2017 WL 5495808, at *5 (E.D.N.Y. Mar. 22, 2017) ("The Supreme Court has held that the Fourth Amendment's protections also apply to regulatory inspections of homes and businesses."), *aff'd*, 710 F. App'x 38 (2d Cir. 2018).

   *Camara* also clarified that, although administrative searches are not subject to the same standards as governing criminal searches, 387 U.S. at 538–39, such searches, "when authorized and conducted without a warrant procedure[,] lack the traditional safeguards which the Fourth Amendment guarantees to the individual," *id.* at 534; *see also Airbnb, Inc.*, 373 F. Supp. at 487

(noting that administrative searches still require officials "to obtain an administrative warrant that satisfies a relaxed standard of probable cause" and citing *Camara*, 387 U.S. at 538); *Marom*, 2017 WL 5495808, at *5 ("[P]rior to conducting a regulatory inspection of a private home, a government officer must either obtain the homeowner's or tenant's permission, or obtain a warrant if permission is refused."). Accordingly, the Supreme Court has clarified that—at minimum—"absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 576 U.S. at 420; *see also Mamakos v. Town of Huntington*, 715 F. App'x 77, 78 (2d Cir. 2018) (summary order) (noting the "dispositive factor" for determining whether ordinances authorizing municipal inspections of residential properties are constitutional "was whether the ordinance requires either consent or a warrant before a search is conducted").

By any reading of *Camara* and *Patel*, § 149-42(A) comes up short. As an initial matter, § 142-42(a) plainly qualifies as a "formal policy." *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."). Section 142-42(A) provides that "Building Department inspectors are hereby authorized and have the right in the performance of their duties, to enter any premises during normal business hours and in emergencies whenever necessary to protect the public interest." City of Mt. Vernon Code, § 142-42(A). The ordinance thus authorizes broad searches during business hours without providing any warrant procedure or requirement, any opportunity for precompliance review, or any chance for the property owner or tenant to either consent to or

challenge the warrantless search.[13]  Indeed, the ordinance is strikingly similar to the one at issue

in *Camara*, wherein the Court held that the tenant "had a constitutional right to insist that the

inspectors obtain a warrant to search." *Camara*, 387 U.S. at 540.[14]  Accordingly, Plaintiff has

plausibly alleged that § 149-42(A) is unconstitutional.  *See Mamakos*, 715 F. App'x at 78

("Ordinances that do not provide for the warrant procedure in cases where the owner refuses

consent are not permissible because they impose an unconstitutional condition on the owner of

the property."); *Wisoff v. City of Schenectady*, 670 F. App'x 724, 725 (2d Cir. 2016) (summary

order) (affirming the lawfulness of an ordinance authorizing municipal inspections of residential

property "either with the consent of the owners or, absent consent, pursuant to a search

warrant"); *see also MS Rentals, LLC v. City of Detroit*, 362 F. Supp. 3d 404, 417 (E.D. Mich.

2019) (holding that a housing inspection ordinance allowing municipal officials "to enter any

building, premises, or structure within the city . . . at reasonable times to inspect" was facially

unconstitutional because it "did not provide for any precompliance review").

     The City does not attempt to defend the constitutionality of § 149-42(A) or engage in any

way with the case law on the constitutional protections afforded to administrative searches.

Instead, the City merely asserts, first, that Plaintiff does not sufficiently allege "that a particular

---

[13]  To the contrary, the municipal code also mandates that "[o]wners, agents, operators, executive officers of corporate owners, occupants, contractors, lessees or tenants *shall be responsible for providing access* to all parts of the premises within their control to authorized Building Department personnel acting in the performance of their duty," § 149-42(B) (emphasis added), and provides that "[f]ailure to comply with the mandates of this section shall result, upon conviction, in a mandatory fine of $100 or imprisonment for 15 days, or both such fine and imprisonment," § 149-42(J).

[14]  The ordinance in *Camara* provided that "[a]uthorized employees of the City departments or City agencies, so far as may be necessary for the performance of their duties, shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the City to perform any duty imposed upon them by the Municipal Code."  387 U.S. at 526.

intrusion onto [P]laintiff's property was caused by [§] 149-42(A), or that a particular municipal official relied on [§] 149-42(A) to justify an unconstitutional entry onto [P]laintiff's property," and second, that as alleged in the Amended Complaint, any "[e]ntrance to the property would have been granted by consent of the tenant," which is a recognized exception to the Fourth Amendment's warrant requirement.  (Reply 7–8; *see also* City's Mem. 10.)  Both arguments fail.

First, there are sufficient allegations in the Amended Complaint and Plaintiff's Opposition to infer that the alleged intrusions occurred because of § 149-42(A).  For example, Plaintiff provides an affirmation submitted by the City's corporation counsel in connection with Plaintiff's state case in which corporation counsel specifically ties Humphreys' actions and her authority to perform them to § 149-42(A).  (*See* Opp'n 22–23.)  Moreover, Plaintiff alleges that Humphreys declared she had "entry rights" to enter the property due to the "Stop Work Order" on the door, (Amend. Compl ¶ 58), and that City officials in general "erroneously believed" that § 149-42(A) "granted them unfettered access to any residence absent a warrant," (*id.* ¶ 103(b)).  Accordingly, and particularly in light of the solicitude afforded to Plaintiff's pro se status, *see Triestman*, 470 F.3d at 474, the Court concludes Plaintiff has sufficiently alleged that the constitutional violations occurred because of the allegedly unconstitutional ordinance.

Second, although the City is correct that consent is an exception to the warrant requirement, *see Palmieri*, 392 F.3d at 78–79; *Cox*, 2020 WL 127890, at *5, Plaintiff does not allege that his tenant gave consent for *all* the searches at issue.  Plaintiff alleges that the Property underwent inspections "approximately 20 to 30 times."  (Amend. Compl. ¶ 21.)  Of the specific inspections discussed in the Amended Complaint, Plaintiff only alleges his tenant's involvement in a few of them, (*see id.* ¶¶ 26, 36, 40, 47), and, to the contrary, alleges that he witnessed "Humphreys on [his] property walking around *unescorted*" on multiple occasions, (*id.* ¶ 37

22

(emphasis added); *see also id.* ¶¶ 24, 29, 63).  As such, it is simply not reasonable to infer that

Plaintiff's tenant gave consent for each and every alleged warrantless search.

Accordingly, because Plaintiff has plausibly alleged both that § 149-42(A) is

unconstitutional and that it was the cause of the constitutional violations he allegedly suffered, he

has stated a claim for *Monell* liability based upon a formal policy.

### c.    Widespread Custom or Practice

Plaintiff's attempt to plead *Monell* liability based on *informal* policies, however, do not

fare as well.  Turning first to Plaintiff's "widespread practice" theory of *Monell* liability, *see*

*Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19,

2022), to demonstrate a de facto policy or custom through a widespread practice, a plaintiff must

"show that the policymaker was aware of a subordinate's unconstitutional actions, and

consciously chose to ignore them, effectively ratifying the actions," *Buari v. City of New York*,

530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty Am. v. Town of W. Hartford*, 361

F.3d 113, 126 (2d Cir. 2004)).  A practice can constitute a custom under *Monell* when it is

"persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage'

with the force of law" and to "imply the constructive knowledge of policymaking officials."  *In*

*re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y.

2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also*

*Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that, to

demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under

*Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing

*Praprotnik*, 485 U.S. at 127)).

To establish a widespread practice, Plaintiff points to: (i) the alleged constitutional deprivations that he suffered, (Pl's Opp'n 13); (ii) the "prevalent practice of [Code Enforcement Officers] demanding cash payments," (*id.* at 12); (iii) three other lawsuits involving allegedly comparable conduct, (*id.* at 11); and (iv) Mount Vernon's insufficient record-keeping and alleged lack of SOPs, as detailed in the Senate Report, (*id.* at 12–13).

First, apart from conclusory statements, Plaintiff does not allege that the City performed warrantless searches on any other property than his, nor does he allege that the City engaged in allegedly retaliatory behavior to any other individual apart from himself. (*See generally* Amend. Compl.) Nor does he point to any instance of Code Enforcement Officers "demanding cash payments" from any other person other than him. (*Id.*) This is insufficient to sustain a *Monell* claim. *See Kiss*, 2024 WL 1210941, at \*23 (dismissing a *Monell* claim where "[p]laintiff only points to the alleged constitutional deprivations that he suffered . . ., and he entirely fails to identify any other incidents that would indicate a pattern or practice"); *see also McCormick v. County of Westchester*, No. 19-CV-2916, 2023 WL 2632204, at \*10 (S.D.N.Y. Mar. 24, 2023) (dismissing a *Monell* claim where "[p]laintiff [did] not point to any instance of the [municipality] failing to place threatened inmates into protective custody beyond his own"); *Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at \*6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at \*4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case" (citations omitted)).

Next, the three lawsuits Plaintiff cites are insufficient to establish a pattern of unconstitutional activity.  To begin, the first two did not result in an adjudication of liability. *Cupcake Cutie Boutique, Inc. v. Thomas*, No. 19-CV-3735 (S.D.N.Y.), was voluntarily dismissed without a finding of liability after the parties settled.  (*See* 19-CV-3735, Dkt. Nos. 20–22.)  *Kela Tennis Inc. v. Lexington Co.*, No. 18-CV-12279 (S.D.N.Y.), did not even include the City as a party and was dismissed after remand to state court.  (*See* 18-CV-12279, Dkt. No. 17; *see* New York Supreme Court, Westchester County, 68510/2015, Dkt. No. 178.)  As courts in this District have noted:

> To the extent the complaints . . . were found to be unsubstantiated or were settled without an admission of liability by the [City], those complaints do not provide a valid basis for concluding that the [City] was deliberately indifferent to . . . [the allegedly unconstitutional behavior], because they do not, by themselves, establish that such behavior previously occurred.

*Falls v. Campbell*, No. 17-CV-35, 2019 WL 1255768, at *6 (S.D.N.Y. Mar. 19, 2019); *see also Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 WL 2819459, at *19 (S.D.N.Y. July 19, 2022) ("[C]ourts in this district have consistently held that citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability.*" (emphasis in original)); *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at *5 (S.D.N.Y. Feb. 28, 2020) (same).  And while the third case, *Mega Beverage Redemption Center, Inc. v. The City of Mount Vernon*, No. 653251/2016 (N.Y. Sup. Ct.), *did* result in a judgment against the City, "the existence of one lawsuit finding liability," particularly one filed nearly a decade ago, "does not strike the [c]ourt as enough to plausibly allege an obvious need to act on the part of the municipality."  *Roman*, 2022 WL 2819459, at *21

(alterations adopted and quotation marks omitted); *see also Bethune*, 2020 WL 1035208, at *5 (finding "the existence of two lawsuits filed over the course of five years—and six years prior the initiation of the present lawsuit" as insufficient to state a *Monell* claim); *Falls*, 2019 WL 1255768, at *6 (finding that "[t]wo lawsuits alleging [a similar constitutional violation] in a period of over 14 years are insufficient to establish a policy or custom").

Furthermore, even if the prior lawsuits *were* sufficient to establish a pattern of unconstitutional activity, Plaintiff has not alleged facts describing the City's response (or lack thereof) to the lawsuits, or any facts demonstrating that the City "consistently failed" to address those prior allegations.  *See Bethune*, 2020 WL 1032508, at *5 ("Plaintiff here does not plead any facts establishing that any alleged abuses in those prior lawsuits were caused by a failure to train officers in the proper handling of the food issues alleged in the present complaint." (quotation marks omitted)); *see also Falls v. Orange County*, No. 17-CV-1339, 2018 WL 718417, at *4 (S.D.N.Y. Feb. 5, 2018) ("A litany of prior lawsuits may suffice to put the City on notice that greater training, supervision, or officer discipline was needed, but plaintiff makes only conclusory allegations regarding the City's response to the lawsuits.").

Finally, to the extent Plaintiff attempts to establish a widespread practice by pointing to the City's alleged insufficient record-keeping and lack of SOPs, this theory, too, fails. Specifically, Plaintiff argues that the Senate Report and DBSC letter demonstrate that "there is no formalized training program for City employees, which leads to arbitrary enforcement actions," (Pl's Opp'n 14), and "exacerbate[s]" the City's "persistent and systemic violation of residents' constitutional rights," (*id.* at 11).  Although a report can be used to evidence a policy or custom if it is "directly related to the constitutional deprivation alleged by the plaintiff," courts have also rejected reliance on such reports where they "bore no connection to the specific factual

allegations of the plaintiff's case." *Buari*, 530 F. Supp. 3d at 401 (collecting cases); *see also Isaac v. City of New York*, No. 16-CV-4729, 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (rejecting reliance on research report because the "pleading in this case fails to make [a] connection" between the report and the allegations), *report and recommendation adopted,* 2018 WL 4583481 (E.D.N.Y. Sept 24, 2018).  The Senate Report and DBSC Letter detail a pervasive lack of training, inspections, and code enforcement in New York State and the City specifically. (*See* Senate Report 65, 85–86; DBSC Ltr. 2–3.)  But the gravamen of Plaintiff's allegations is that the City *over* enforced its housing code with respect to Plaintiff and his Property, and that it did so without due process or good cause.  (*See, e.g.*, Amend. Compl. ¶ 21 (alleging the City inspected his Property "approximately 20 to 30 times").)  The Report and Letter thus are not directly connected to the specific factual allegations of this Action, and do not suffice, on their own, to establish a widespread practice or custom.  *See Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *6 (E.D.N.Y. Sept. 22, 2017) ("Plaintiff's reliance on reports and articles regarding misconduct by NYPD officers are inadequate to allege a policy or custom of the City, let alone allege that policy or custom is the one that gave rise to *Plaintiff's* alleged violation." (emphasis in original) (quotation marks omitted)); *see also Yanez v. City of New York*, 29 F. Supp. 2d 100, 112 & n.6 (E.D.N.Y. 1998) (granting summary judgment dismissing plaintiff's *Monell* claims, where "plaintiff has not adequately explained the connection between the alleged plot [at issue in the case] and the blue wall of silence described in the Mollen report" (quotations marks omitted)).[15]

---

[15]  Moreover, to the extent that Plaintiff argues the City had a custom of no SOPs and improper recordkeeping, which led to "arbitrary and capricious enforcement actions," (Pl's Opp'n 12), he again alleges no instances of such arbitrary enforcement other than the ones he alleges he personally experienced, which, as discussed above, is insufficient to establish a widespread practice or custom, *see, e.g.*, *McCormick*, 2023 WL 2632204, at *10.

In sum, the ways by which Plaintiff seeks to establish a widespread practice and custom "fall short in light of a lack of genuine findings of wrongdoing and a lack of detailed factual assertions." *Roman*, 2022 WL 2819459, at *22.[16]

d. Failure to Train

Plaintiff is similarly unable to plausibly allege "a failure by policymakers to provide adequate training . . . to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *See Atadzhanov*, 2022 WL 4331304, at *11 (quotation marks omitted).  Courts have made clear that:

> [a] failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."

*Kiss*, 2024 WL 1210941, at *24 (quoting *City of Canton*, 489 U.S. at 390).  The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights."  *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d

---

[16] Plaintiff's reliance on *Reynolds v. Giuliani*, 506 F.3d 183 (2d Cir. 2007), is unavailing. In *Reynolds*, the Second Circuit noted that "*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Id.* at 192.  But again, Plaintiff does not allege any other specific instances sufficient to establish a pattern of misconduct, and as noted above, the Report and Letter are insufficient to establish such a pattern on their own.

Cir. 1992)).  "[D]emonstration of deliberate indifference requires a showing that the official

made a conscious choice, and was not merely negligent." *Jones v. Town of East Haven*, 691 F.3d

72, 81 (2d Cir. 2012) (citations omitted).  "A pattern of similar constitutional violations by

untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes

of failure to train," because "[w]ithout notice that a course of training is deficient in a particular

respect, decisionmakers can hardly be said to have deliberately chosen a training program that

will cause violations of constitutional rights." *Connick*, 563 U.S. at 62 (citation and quotation

marks omitted).

  To allege a failure-to-train theory, a plaintiff must "identify a specific deficiency in the

city's training program and establish that that deficiency is 'closely related to the ultimate injury,'

such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129

(quoting *City of Canton*, 489 U.S. at 391.)  Both elements are necessary "to prove that the

deprivation occurred as the result of a municipal policy rather than as a result of isolated

misconduct by a single actor," and thus "ensure that a failure to train theory does not collapse

into *respondeat superior* liability." *Id.*

  Here, rather than point to a specific deficiency, Plaintiff asserts that the City had "no

training program" whatsoever for its employees—in particular employees in the Department of

Buildings—as evidenced by the lack of SOPs and records regarding training programs.  (Pl's

Opp'n 13–14; *see* Amend. Compl. ¶ 103(e)(iv).)[17]  Assuming that Plaintiff has sufficiently

identified a training deficiency, Plaintiff has failed to establish a causal connection between this

---

[17]  As the City points out, the Senate Report does not entirely support Plaintiff's
allegation that the City and/or Department of Buildings *maintains* no SOPs.  (*See* Reply 10.)
Instead, the Report only notes that no SOPs were *provided* to the investigation team when
requested.  (*See* Senate Report 50.)

deficiency and the alleged constitutional deprivations.  As the City points out, "there is an obvious mis-match between [Plaintiff's] failure-to-train claim and the substance of [Plaintiff's] underlying claim."  (Reply 12.)  Specifically, Plaintiff points to the Senate Report and the DBSC letter as evidencing a complete lack of training.  (*See* Pl's Opp'n 14.)  As noted above, both the Senate Report and DBSC Letter describe a pervasive issue of underenforcement from the City's Department of Buildings, and both recommend that inspections and enforcement be increased. (*See* Senate Report 65, 85–86; DBSC Ltr. 2–3.)  But again, Plaintiff's claim that he was *over* inspected and was the victim of *over* enforcement, ultimately violating his constitutional rights. (*See* Amend. Compl. ¶¶ 21, 90, 103(b).)[18]  Thus, Plaintiff is not able to establish that the alleged training deficiency is "closely related to the ultimate injury, such that it actually caused the constitutional deprivation."  *Amnesty Am.*, 361 F.3d at 129 (quotation marks omitted); *see also McCormick*, 2023 WL 2632204, at *12 (dismissing *Monell* claim where a "[p]laintiff's conclusory assertions [did] not suffice to plausibly allege that a deficiency in training caused his injury"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused . . . [the] alleged violations of [the] plaintiff's rights").

---

[18]  Illustrating this disconnect, in the excerpt of the DBSC Letter attached to his Opposition, Plaintiff annotates the statement in the letter that "periodic fire and property maintenance inspections had not been conducted since approximately 2009" with the comment "They have come to my home 30xs; one improv fire inspection; I guess all the inspections were reserved for my property."  (*See* Pl's Opp'n 20 (Ex. C).)

e.  Failure to Screen

Finally, Plaintiff cannot establish *Monell* liability based on the City's alleged practice of improperly screening and hiring its employees, specifically, Humphreys.  (Amend. Compl. ¶ 103(e)(v); Pl's Opp'n 15.)

Municipal liability under *Monell* can be established by a "failure to screen" an employee (i.e., negligent hiring) if a plaintiff can "plead facts to support an inference that the municipality's hiring of the individual reflected 'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.'"  *Lehal v. Cent. Falls. Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at *8 (S.D.N.Y. Nov. 21, 2016) (quoting *Brown*, 520 U.S. at 411).  "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the *plainly obvious consequence* of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"  *Noonan v. City of New York*, No. 14-CV-4084, 2015 WL 3948836, at *5 (S.D.N.Y. June 26, 2015) (quoting *Brown,* 520 U.S. at 411) (emphasis added).  To establish a failure-to-screen theory, Plaintiff must allege sufficient facts to find that the employee "was highly likely to inflict the *particular* injury suffered by the plaintiff."  *Id.* at *5 (quoting *Brown*, 520 at 412) (emphasis in original); *see also Lehal*, 2016 WL 7377238, at *8 ("[T]he plaintiff must plausibly allege a strong connection between the background of the particular applicant and the specific constitutional violation alleged." (internal quotation marks omitted)).

In the Amended Complaint, Plaintiff alleges that Humphreys "failed to reveal her prior criminal history" in her employment application, which history included "serious felonies in

Florida related to violence, theft, and a violent altercation involving a torch," and that the City's failure to properly vet Humphreys led to the violations of Plaintiff's rights. (Amend. Compl. ¶ 103(e)(v).) There is a disconnect, however, between Humphreys' alleged criminal history and the constitutional violations Plaintiff alleges Humphreys committed here—specifically, the violation of Plaintiff's right against unlawful searches and seizures. (*See, e.g., id.* ¶ 90 (alleging Humphreys "searched [Plaintiff's] property without a warrant").) Even accepting the allegations regarding Humphreys' criminal history as true—as the Court must, *Kiss*, 2024 WL 1210941, at *7—all this establishes is that Humphreys has a criminal history, "not that [s]he has actually admitted to, or was found liable for, conduct similar to that alleged by Plaintiff." *See Lehal*, 2016 WL 7377238, at *13 (rejecting failure-to-screen theory where plaintiff alleged no connection between the individual defendant's past misconduct and the violation of plaintiff's rights). Thus, because "it is not 'plainly obvious' that hiring someone with [Humphreys'] background would have caused the alleged deprivations of Plaintiff's constitutional rights asserted in this case," *id.*, Plaintiff's failure-to-screen theory fails, *see also Noonan*, 2015 WL 3948836, at *5 (dismissing *Monell* claim for failure to screen where Plaintiff "pleaded no facts that would support an inference that the City had reason to believe that [the employee's] background would predispose him to sexual misconduct, nor any facts indicating prior wrongdoing by [the employee]"); *Cooper v. City of New York,* No. 12-CV-8008, 2013 WL 5493011, at *7 (S.D.N.Y. Oct. 2, 2013) (dismissing *Monell* claim based in part on failure to properly screen police officers where complaint only contained "mere conclusory statements" insufficient to establish liability).

~*~*~*~

In sum, although Plaintiff has failed to plausibly allege a theory of *Monell* liability based upon an informal practice, he has successfully alleged *Monell* liability based upon a formal practice—i.e., the allegedly unconstitutional ordinance. Accordingly, the City's Motion to dismiss the *Monell* claim is denied.

### B.  Motion for Joinder

Plaintiff moves to join insurer Safety National as a third-party defendant pursuant to Rules 19(a) or 20(a)(2). (*See* Joinder Mtn. 1–2.) According to Plaintiff, Safety National issued Public Entity Excess Retained Limits Liability Insurance Policy No. XPR4068013 to the City, which covers "bodily injury, property damage, personal injury, and wrongful acts performed within the scope of official duties" up to a limit of $5,000,000 per occurrence. (*See* Joinder Mem. 2; Pl's Joinder Decl. ¶ 2.) Although Safety National has disclaimed coverage for the Defendants' actions related to Plaintiff's claims, (Pl's Joinder Decl. ¶¶ 4–5), Plaintiff argues that Safety National's presence in the Action "is necessary to determine coverage owed to Defendants, which directly impacts the enforceability of any judgment or settlement in [Plaintiff's] favor," (Joinder Mem. 3). Safety National opposes the Motion, arguing that Plaintiff lacks standing to join Safety National or assert any claims against it. (*See* Safety Nat'l Mem. 5–6.) The Court agrees that Safety National cannot be joined in this Action.

Under Rule 19(a), an absent party "*must* be joined as a party" to an action if their joinder "will not deprive the court of subject-matter jurisdiction" and "in that [party's] absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a) (emphasis added); *Smith v. Nkomarume*, No. 17-CV-6369, 2018 WL 4660362, at *3 (S.D.N.Y. Sept. 5, 2018) ("[J]oinder of an additional defendant is considered mandatory when, absent joinder, the court cannot accord complete relief among existing parties." (internal quotation marks omitted)).

Under Rule 20, by contrast, joinder of an absent party is permissible if "any right to relief is asserted against [the absent party] jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and [] any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A)–(B).

Plaintiff, however, cannot join Safety National as a third-party because Plaintiff does not have standing to assert claims against it. In *Lang v. Hanover Insurance Co.*, 820 N.E. 2d 855 (N.Y. 2004), the New York Court of Appeals held that a plaintiff "has no common-law right to seek relief directly from a tortfeasor's insurer," and only has a statutory right to seek such relief "*after* [a] plaintiff has obtained a judgment in the underlying personal injury action." *Id.* at 858 (emphasis added) (citing N.Y. Ins. L. § 3420(a)(2)). Thus, "[u]nder New York law, claimants may bring a direct action against an insurer *only* if . . . the injured party first obtains a judgment against the tortfeasor, serves the insurance company with a copy of the judgment, and awaits payment for thirty days." *U.S. Underwriters Ins. Co. v. Ziering*, No. 06-CV-1130, 2010 WL 3419666, at *5 (E.D.N.Y. Aug. 27, 2010) (emphasis added) (citing N.Y. Ins. Law § 3420(a)(2)); *see also St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 83 (2d Cir. 2005) ("[U]nder New York law, [the appellant] does not have an interest sufficient to allow it to assert claims directly against [the third parties] as insurers of [the appellee] unless [the appellant] first obtains a judgment against [the appellee]." (citing *Lang*, 820 N.E.2d at 856)); *Zyburo v. Cont'l Cas. Co.*, 60 F. Supp. 3d 531, 535 (S.D.N.Y. 2014) (dismissing an action against a tortfeasor's insurer for lack of standing where the plaintiff "ha[d] not yet obtained a judgment

against the insured" (citing *Lang*, 820 N.E.2d at 858)).[19]   Accordingly, multiple courts in the

Second Circuit have held that injured parties "have no standing to pursue a declaratory judgment

against an insurer unless and until the requirements of § 3420, including securing a judgment,

have been satisfied." *See Kehagias v. Philadelphia Indem. Ins. Co.,* 345 F.R.D. 46, 52 (S.D.N.Y.

2023) (collecting cases).  And for the same reason, "courts in this Circuit have consistently

denied intervention to injured parties in coverage actions between the insured and their insurer."

*Id.* (collecting cases).

Applying the same reasoning here, the Court concludes that Plaintiff does not have

standing to join Safety National as a party to this Action or otherwise assert any claims against

Safety National prior to Plaintiff first obtaining a judgment from the City that has gone

unsatisfied for over thirty days.  *See Knox v. Ironshore Indemnity Inc.*, No. 20-CV-4401, 2021

WL 256948, at *3 (S.D.N.Y. Jan. 26, 2021) (dismissing an action because, "[s]ince [p]laintiffs

do not have a judgment against the insured party [defendant], [p]laintiffs have not satisfied a

condition precedent to suit under the direct action statute"); *Hartford Ins. Co. v. Mitlof*, 123 F.

Supp. 2d 762, 770 (S.D.N.Y. 2000) (holding that personal injury claimant could not intervene

either as a right or permissively, as "intervention would circumvent the judgment requirement

of § 3420, a prerequisite for actions by injured third parties against indemnity insurers, and

---

[19]   As the requirements of the relevant New York insurance law "are substantive in
nature, not procedural," this Court is bound to apply them.  *Zyburo*, 60 F. Supp. at 534 ("[T]he
New York Court of Appeals has stated unequivocally that [New York Insurance Law § 3420] is
substantive in nature.").

create a right not contemplated by the state legislature.").[20]  Accordingly, Plaintiff's Joinder

Motion is denied.[21]

### C.  Motion for Sanctions

Plaintiff's next Motion arises in connection with the "destruction of body-worn camera

footage . . . that is relevant to Plaintiff's claims."  (*See* Not. of Mtn. for Sanctions 2.)

Specifically, Plaintiff points to the destruction of body-camera footage from an incident on

February 26, 2023, on which date Plaintiff alleges that City employees unlawfully entered the

Property.  (*See generally* Pl's Sanctions Mem.; Fecteau Decl. in Supp. of Sanctions, Ex. Nos.

1–4 (Dkt. Nos. 128-1–128-4).)  There is no dispute here that the MVPD destroyed the body-

camera footage in question.  (*See* City's Opp. to Sanctions 2 (conceding the February 26, 2023,

---

[20]  In support of his argument that Safety National is an indispensable party that must be joined under Rule 19, Plaintiff cites to a single case from the Third Circuit, which Plaintiff claims stands for the proposition "that insurers are necessary parties when their involvement determines the scope of relief."  (Joinder Mem. 3 (citing *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993).)  But *Janney* involved an attempt to join a *co-obligor*—not an insurer—whose presence was considered necessary due to a potential contractual imposition of joint and several liability against the co-obligors.  *Id.* at 406. Moreover, *Janney* is irrelevant to the application of the governing New York insurance law here.

[21]  Given this ruling, the Court also denies as moot Plaintiff's recent Motion for Judicial Notice Pursuant to Federal Rule of Evidence 201, which asks the Court to take notice of prior court decisions involving Safety National, (*see* Dkt. No. 161), and Plaintiff's Request for Clarification regarding Safety National's representation, (*see* Dkt. No. 167).

The Court also notes that Plaintiff's conduct toward Safety National, as reflected on the docket and in filings from Safety National, is borderline harassment.  (*See, e.g.*, Dkt. Nos. 100–02, 110–13, 123, 166.)  Plaintiff is warned that if he persists in contacting Safety National or attempting to involve it in this Action any further, without valid reason, the Court will consider sanctions.  *See Azzarmi*, 2025 WL 35003, at *8 (noting "district courts may issue sanctions to parties (including pro se parties) where they are acting in 'bad faith, vexatiously, wantonly, or for oppressive reasons'" (citing *Sassower*, 973 F.2d at 80–81)); *id.* at *9 (noting that a pro se litigants "using the court system as a means of harassing [d]efendants . . . meet[s] the requirements for vexatiousness and bad faith required to impose sanctions."); *Keitel v. D'Agostino*, No. 21-CV-8537, 2023 WL 3560553, at *3 (S.D.N.Y. May 19, 2023) ("[D]istrict courts have inherent authority to impose sanctions on litigants . . . who show themselves to be serial abusers of the judicial system." (internal quotation marks omitted)).

footage was not preserved); Fecteau Decl. in Supp. of Sanctions Mem., Ex. Nos. 2–4 (Dkt. Nos. 128-2–128-4).)  After Plaintiff served the City with a request pursuant to New York's Freedom of Information Law on July 19, 2023, the MVPD informed Plaintiff that the footage had been destroyed in accordance with its 90-day retention policy.  (*See* City's Opp'n to Sanctions 3; Fecteau Decl. in Supp. of Sanctions, Ex. 3 at 5.)  Although the City acknowledged that, per state law, the MVPD should have maintained a 180-day retention policy, (Fecteau Decl. in Supp. of Sanctions, Ex. 2), the City also asserted that the destruction of the footage was not intentional or in bad faith, (Fecteau Decl. in Supp. of Sanctions, Ex. 1 at 2, Ex. 3 at 5).  Plaintiff moved for sanctions in the Supreme Court of the State of New York, County of Westchester, and the State Court concluded that the destruction of the footage was "at a minimum, negligent, and thus sanctions are warranted in the form of an adverse inference charge against Respondents." (Fecteau Decl. in Supp. of Sanctions, Ex. 3 at 5–6.)

Plaintiff now seeks sanctions pursuant to Rule 37(e), including the imposition of an adverse inference against the City, (*see* Not. of Mtn. for Sanctions 2), and argues that the City's "failure to preserve this key footage . . . has caused significant prejudice to Plaintiff's ability to prove his claims and oppose or survive dismissal," (Pl' Sanctions Mem. 2).  The City argues that spoliation sanctions are not warranted, as Plaintiff has not shown that the destruction of the body-camera footage was done intentionally or in bad faith.  (City's Opp'n to Sanctions 4.)  The Court agrees that sanctions are not warranted here.

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Rivera v. Hudson Valley Hosp. Grp., Inc.,* No. 17-CV-5636, 2019 WL 3955539, at *3 (S.D.N.Y. Aug. 22, 2019) (quoting *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 706 (S.D.N.Y. 2017)); *see also In re*

*Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008)). "A party

seeking sanctions for spoliation has the burden of establishing the elements of a spoliation

claim." *Tchatat*, 249 F. Supp. 3d at 706 (citation omitted). "These elements are '(1) that the

party having control over the evidence had an obligation to preserve it at the time it was

destroyed; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the

destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense.'" *Id.* (alteration omitted) (quoting

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)). In other words, "for

sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after

evidence *actually existed and was destroyed.*" *Farella v. City of New York*, No. 05-CV-5711,

2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007) (emphasis in original).

      "For a movant to succeed in securing spoliation sanctions, [he] must first show 'prejudice

. . . from loss of the information.'" *Nurmagomedov v. Legionfarm, Inc.*, No. 23-CV-6683, 2024

WL 4979235, at *2 (S.D.N.Y. Dec. 4, 2024) (quoting Fed. R. Civ. P. 37(e)(1)). "If that

threshold is met, a court "may order measures no greater than necessary to cure the

prejudice." *Id.* (quoting Fed. R. Civ. P. 37(e)(1)); *N. Am. Soccer League, LLC v. United States

Soccer Fed'n, Inc.*, --- F. Supp. 3d ----, 2024 WL 4744612, at *4 (E.D.N.Y. Oct. 28, 2024)

(same). However, "if a court finds 'that the party acted with the intent to deprive another party

of the information's use in the litigation,' harsher sanctions may be imposed," including, as

relevant here, "an adverse inference." *Nurmagomedov*, 2024 WL 4979235, at *2 (citing Fed. R.

Civ. P. 37(e)(2)); *see Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (holding that bad faith

spoliation "requires a finding of intent to deprive another party of the information's use in the

litigation" (internal quotation marks omitted)). Accordingly, "[a] party's acting negligently or

knowingly will not suffice to justify the sanctions enumerated in Rule 37(e)(2)," including, as relevant here, an adverse inference instruction. *Hoffer*, 128 F.4th at 438.

If the proper showing is made, "[d]etermining the proper sanction to impose for spoliation is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis." *Deanda v. Hicks*, 137 F. Supp. 3d 543, 554 (S.D.N.Y. 2015) (citation, quotation marks, and alterations omitted). At all times, however, a sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position [it] would have been in absent the wrongful destruction of evidence by the opposing party." *Tchatat*, 249 F. Supp. 3d at 707 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "[A] court should always impose the least harsh sanction that can provide an adequate remedy." *Id.* (citation and quotation marks omitted).

Even assuming, for the purposes of the instant Motion, that the destroyed footage was relevant to Plaintiff's claims, sanctions are still not warranted here because Plaintiff has not presented evidence that such destruction was done intentionally or in bad faith. Plaintiff points only to two things: (1) MVPD's utilization of a 90-day retention policy, rather than the New York State mandated 180-retention policy; and (2) that Plaintiff reported the February 26, 2023, incident to MVPD Internal Affairs on February 28, 2023, thus placing the MVPD on notice. (*See* Pl's Sanctions Mem. 3–4; Fecteau Decl. in Supp. of Sanctions, Ex. 3 at 4–5.) Although this amounts to "some circumstantial evidence bearing on intent," particularly given the MVPD should have been aware of the need to preserve the February 26, 2023, footage, it is "still a ways off from demonstrating an affirmative intent to deprive." *N. Am. Soccer League, LLC*, 2024 WL 4744612, at *5. Accordingly, the Court cannot conclude, on this record alone, that the

destruction was done with an intent to deprive Plaintiff of evidence. *See Karlyg v. City of New York*, No. 20-CV-991, 2024 WL 4333858, at *8 (E.D.N.Y. Sept. 28, 2024) (denying a motion for sanctions where "the presented evidence is capable of more than one interpretation, and does not constitute clear and convincing evidence of an intent to deprive" (internal quotation marks omitted)); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 522 (S.D.N.Y. 2022) (denying a motion for sanctions where, "[w]hile one might envision different steps [defendant] could have taken to ensure" the evidence remained available, "its failure to do so amounts to, at most, ordinary negligence, far from the intent to deprive required for the severe sanctions under Rule 37(e)(2)"); *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-CV-9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018) (despite some evidence suggesting "[s]elective deletion" that "*could* have been motivated by a desire to deprive [plaintiff] of evidence damaging to [d]efendants' position in this litigation," there was no basis on the record before the court "to conclude whether [d]efendants even engaged in selective deletion, much less whether they did so with an intent to deprive" (emphasis added)).[22]

Moreover, Plaintiff has not demonstrated any prejudice from the destruction at this stage. Plaintiff argues the footage would have "corroborated Plaintiff's allegations" of illegal conduct

---

[22] The cases Plaintiff cites to do not change the outcome. First, as the City points out, (*see* City's Opp'n to Sanctions Mot. 5), *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), was specifically superseded by the 2015 amendments to Rule 37(e), which clarified that the "*intent* to deprive" requirement "is meant to 'reject[] cases such as [*Residential Funding*], that authorize the giving of adverse-inference instructions on a finding of negligence or *gross negligence*,'" *see Aquino by Convergent Distributors of Tex., LLC v. Alexander Cap., LP*, No. 21-CV-1355, 2023 WL 2751541, at *8 (S.D.N.Y. Mar. 31, 2023) (emphases in original), *aff'd sub nom. Aquino v. Alexander Cap. LP*, No. 23-1109, 2024 WL 2952497 (2d Cir. June 12, 2024). Second, *Byrnie v. Town of Cromwell*, 243 F.3d 93 (2d Cir. 2001), was also superseded by the 2015 amendments, *see Gittens-Bridges v. City of New York*, No. 22-810, 2023 WL 8825342, *3 (2d Cir. Dec. 21, 2023) (summary order), and, in any event, involved "evidence of intentional destruction sufficient to show a culpable state of mind," *Byrnie*, 243 F.3d at 109.

on behalf of the City, and thus, that the loss of the footage "materially prejudice[ed] Plaintiff by depriving him of critical evidence necessary to substantiate his claims." (Pl's Sanctions Mem. 5–6.) However, at the motion to dismiss stage, the Court must accept as true all the factual allegations in the Amended Complaint, *Erickson*, 551 U.S. at 94, and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel*, 992 F. Supp. 2d at 304 n.1. Although the footage— were it to depict what Plaintiff asserts it did—may have bolstered Plaintiff's claims, the *lack* of said footage at this stage of the litigation does not undermine them. *See Sanabria v. Detective Shawn Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *6 (S.D.N.Y. Aug. 12, 2016) ("[A]t the motion to dismiss stage, [p]laintiff need not present evidence [of a constitutional violation] in order for his claims to survive. Plaintiff must simply plead facts from which the Court could conclude, if accepted as true, that a violation has occurred."); *Hussey v. New York State Dep't of L./Off. of Atty. Gen.*, 933 F. Supp. 2d 399, 408 (E.D.N.Y. 2013) ("[A] plaintiff is not required to provide evidence or prove any of [his] claims to survive a motion to dismiss."). Thus, the Court does not find that the destruction of the footage has prejudiced Plaintiff.

Accordingly, Plaintiff's Sanctions Motion is denied without prejudice. If, at a later stage, Plaintiff can demonstrate prejudice or adduce evidence that the destruction of the body-camera footage was done intentionally and in bad faith, Plaintiff may seek to renew the Motion at that time.

### D. Motion for Reconsideration

Next, Plaintiff seeks reconsideration of the Court's January 16, 2025, Order denying Plaintiff's Pre-Letter Motion for Declaratory Judgment (the "Declaratory Judgment Order" (Dkt. No. 125)). Plaintiff previously requested leave to file a motion requesting a declaratory judgment to "clarify the live controversy surrounding the[] ordinances" at issue. (*See* Dkt. No.

119 at 4.)  The Court denied Plaintiff's request "due to the absence of any allegations, let alone evidence that the past conduct that forms the basis of Plaintiff's case is likely to continue." (*See* Declaratory Judgment Order 3.)  Here, Plaintiff asks the Court to reconsider that Order and again requests a declaratory judgment "to ensure [the City] complies with constitutional due process protections." (Reconsideration Mot. 2.)  The Court declines to disturb its prior Order.

In the Second Circuit, motions for reconsideration are judged by a "strict" standard. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see also Harriram v. City Univ. of New York*, No. 22-CV-9712, 2024 WL 4553906, at *3 (S.D.N.Y. Oct. 22, 2024) ("Reconsideration is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" (quoting *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003))).  Motions for reconsideration are not intended to be "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Harriram*, 2024 WL 4553906, at *3 (quotation marks omitted) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)).

To prevail on a motion for reconsideration, Plaintiff is required to show either "an intervening change in law, [the] availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 21 (2d Cir. 2021). Although Plaintiff's Motion and accompanying Declaration are not entirely clear, Plaintiff appears to argue that the Court should reconsider its prior ruling because of new, previously unavailable evidence.  Specifically, Plaintiff argues that on January 22, 2025, he witnessed City employees "unlawfully enter[] a property adjacent to [Plaintiff's] . . . without proper legal

authorization," and provides what appears to be an affidavit from the occupant of that property. (*See* Decl. of M. Fecteau in Supp. of Reconsideration Mot. 2, 5–10.)

In order to prevail on a motion for reconsideration on the grounds of newly discovered evidence, a party must establish that "the evidence [is] admissible and of such importance that it probably would have changed the outcome." *Francis v. AccuBanc Mortg. Corp.,* No. 19-CV-902, 2021 WL 827123, at *4 (S.D.N.Y. Mar. 4, 2021) (quoting *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 147 (2d Cir. 2020)).  Plaintiff has not done so here.  In order to obtain a declaratory judgment, a plaintiff must demonstrate "a sufficient likelihood that he will again be wronged in a similar way" as well as "a 'certainly impending' future injury.'" *Tavenner v. Int'l Bus. Machines Corp.*, No. 21-CV-6345, 2022 WL 4449215, at *7 (S.D.N.Y. Sept. 23, 2022) (alteration omitted) (quoting *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2010)), *aff'd*, No. 22-2318, 2023 WL 4984758 (2d Cir. Aug. 4, 2023).  Plaintiff's new evidence, which suggests—at best—that an unconstitutional search was performed on a third party, does not sufficiently establish that *Plaintiff* will again be wronged.  Accordingly, "because Plaintiff fails to demonstrate that . . . the newly obtained evidence would have altered the conclusion previously reached," *Marhone v. Cassel*, No. 16-CV-4733, 2021 WL 142278, at *4 (S.D.N.Y. Jan. 14, 2021), the Court denies the Reconsideration Motion.

### E.  Pre-Motion Letter for Sanctions

Finally, Plaintiff seeks permission to file a motion to seek monetary sanctions, pursuant to Rule 11(c) and 28 U.S.C. § 1927, and to strike the City's Motion to Dismiss papers "on the grounds of materially misleading representations."  (Pre-Mot. Ltr. 2.)  Specifically, Plaintiff alleges that the City's claim that "no unconstitutional policies or practices exist" is misleading because, in January 22, 2025—months after the City filed its Motion papers—the City

43

"conducted an unlawful inspection" at a neighboring property. (*Id.* at 2–3.) This, Plaintiff argues, warrants sanctions. The Court disagrees.

Plaintiff primarily focuses on the City's assertion in a response to a pre-motion letter that "Mr. Fecteau alleges that his Fourth Amendment rights were violated by warrantless entries on his property. But he has not alleged in his amended complaint, nor does he claim in his pre-motion letter, that there is a risk that such entries will continue into the future." (*See* Pre-Mot. Ltr. 2 (quoting Dkt. No. 124 at 2).) But Plaintiff does not explain in anyway how this is "demonstrably false," given that Plaintiff, in fact, did not allege as such in his Amended Complaint or in the pre-motion letter at issue. (*See generally* Amend. Compl; Dkt. No. 119.) Moreover, Plaintiff does not explain how the alleged inspection of his neighbor's residence on January 22, 2025, proves that the City's statement made a week earlier (on January 16, 2025) was "demonstrably false." Further, Plaintiff does not even attempt to explain how these statements rise to the level of sanctionable conduct or at all justify striking the City's Motion papers.

Accordingly, Plaintiff is denied leave to file another motion for sanctions.[23]

### III.  Conclusion

For the foregoing reasons, all Motions discussed within this Order are denied. The Court will hold a telephonic status conference in this case on April 21, 2025, at 11:00 AM ET.

---

[23] Plaintiff is again reminded that—regardless of Plaintiff's pro se status—the repeated filing of "frivolous claims and motions whose only possible explanation could be harassment and delay of proceedings" may result in sanctions. *Azzarmi*, 2025 WL 35003, at *9; *see also El Bey v. City of New York*, No. 13-CV-8927, 2015 WL 3526987, at *2–3 (S.D.N.Y. June 3, 2015) (issuing a filing injunction against a pro se plaintiff after a finding plaintiff engaged in "a clear pattern of abusing the litigation process" and that there was "a likelihood of continued abuse of that process"); *Sassower*, 973 F.2d at 80–81 (awarding attorney's fees against a pro se plaintiff where the plaintiff repeatedly utilized "entirely vexatious and oppressive tactics").

The Clerk of Court is respectfully directed to terminate the pending Motions.  (Dkt. No. 67, 76, 126, 145, 149, 161, 167.)

SO ORDERED.

Dated:    March 20, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

45